IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

   *Plaintiff.*

   v.

LARVON LANGLEY,

   *Defendant.*

CRIMINAL NO.:  ELH-12-0311

**MEMORANDUM OPINION**

Defendant Larvon Langley, on his own and through counsel, has moved for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  The defendant's pro se motions are docketed at ECF 87 and ECF 89.  The Office of the Federal Public Defender filed a supplement at ECF 102.  Then, through appointed counsel, the defendant filed another motion for compassionate release (ECF 114) and records.  ECF 116.  I shall refer to the defendant's motions collectively as the "Motion."  The government has responded in opposition to the various submissions.  *See* ECF 97, ECF 105, ECF 123.  It has also submitted exhibits.  The defendant has replied.  ECF 128.  Mr. Langley subsequently submitted correspondence to the Court.  ECF 129; ECF 131.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion, in part.  I shall reduce the total sentence to twelve years.[1]

---

[1] This Memorandum Opinion does not resolve defendant's pro se motion under 28 U.S.C. § 2255, based on *Rehaif v. United States*, 139 S. Ct. 914 (2019).  *See* ECF 84.  It is my understanding that the *Rehaif* motion is stayed, pending resolution of certain appellate cases that are expected to provide further guidance.

## I.  Factual and Procedural Background

Pursuant to a Plea Agreement dated October 22, 2012 (ECF 27), Mr. Langley entered a plea of guilty on December 6, 2012 (ECF 26) to Count One of an Indictment charging him with possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1).

In the Plea Agreement, the parties contemplated a base offense level of 24.  ECF 27, ¶ 6(a).  But, there was no agreement as to the defendant's criminal history.  *Id.* ¶ 6(c).  Moreover, the defendant was advised in the Plea Agreement that, if he qualified as an Armed Career Criminal, he faced a mandatory minimum sentence of 15 years' imprisonment, with a maximum of life imprisonment.  *Id.* ¶ 3.

The Plea Agreement included a stipulation of facts.  *Id.* at 9.  It reflects that on April 18, 2012, law enforcement executed a search warrant at defendant's residence while defendant was home.  *Id.*  The officers recovered a .40 caliber semi-automatic pistol and twelve rounds of .40 caliber ammunition, as well as heroin located approximately four feet from the pistol.  *Id.*  In addition, heroin was recovered from defendant's person.  *Id.*  After defendant was informed of his *Miranda* rights, he "admitted that he had drugs on his person and that the firearm and heroin recovered in the residence belonged to him," and that the firearm and ammunition affected interstate commerce.  *Id.*

The United States Probation Office completed a Presentence Report ("PSR") for the defendant.  ECF 34.  In the PSR, the defendant was found to be an Armed Career Criminal under § 4B1.4 of the Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *See* ECF 34, ¶¶ 22, 54, 55. The PSR reflected a final offense level of 31, *id.* ¶ 24, and a criminal history category of VI.  *Id.* ¶ 56.  Under the Guidelines, the advisory range of imprisonment was 188 to 235 months.  *Id.* ¶ 74.

Under 18 U.S.C. § 922(g)(1), it is illegal for a felon to possess a firearm. Section 924(e)(1) of 18 U.S.C. states, in part: "In the case of a person who violates § 922(g) of this title and has three previous convictions by any court referred to in § 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be . . . imprisoned not less than fifteen years. . . ."

Section 924(e)(2)(A) defines the term "Serious Drug Offense." As defendant's prior offenses are all under Maryland law, § 924(e)(2)(A)(ii) is relevant. It defines a serious drug offense as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]"

Thus, in order to qualify as a serious drug offense, the prior Maryland convictions must have prescribed a potential maximum term of imprisonment of at least ten years. Maryland Code, Criminal Law Article ("C.L.") §§ 5-602 and 5-608 are relevant. C.L. § 5-602 prohibits the felony offenses of distribution of a controlled dangerous substance ("CDS") and possession with intent to distribute CDS. C.L. § 5-608 establishes various penalties, and sets a penalty of imprisonment not exceeding 20 years for the first offense under § 5-602 if it involves a Schedule I or Schedule II narcotic drug. C.L. § 5-101(f) defines "controlled dangerous substance." The drugs that appear on Schedule I and Schedule II are set forth in C.L. § 5-402 and C.L. § 5-403, respectively. Heroin is found in Schedule I, at C.L. § 5-402(c)(xv). Cocaine is designated as a Schedule II substance, at C.L. § 5-403(b)(3)(iv); *see also Hurt v. State*, 2015 WL 5926870, at *4 (Md. Court of Special Appeals Sept. 4, 2015).

The PSR reflected that defendant had a long criminal history, dating to 1987. For the purpose of calculating Langley's criminal history, however, not all of his prior convictions scored points. With respect to the matter of Langley's Armed Career Criminal status, the PSR reflected the following qualifying convictions, all in the Circuit Court for Baltimore City.

Paragraph 40 of the PSR indicated that in 1994 Langley was convicted of possession with intent to distribute heroin, for which he received a sentence of five years' imprisonment. Paragraph 43 of the PSR reflected that Langley was convicted of possession with intent to distribute heroin. That offense occurred in May 2001, and in June 2002 Langley was sentenced to a term of 10 years' incarceration. *Id.* In ¶ 46, the PSR referenced an offense that occurred in August 2001; in June 2002, Langley received a concurrent ten-year sentence for possession with intent to distribute both cocaine and heroin. *Id.* And, ¶ 50 of the PSR reflected that Langley received a five-year sentence, without parole, for possession of a handgun by a convicted felon, which also occurred in August 2001. That offense, however, did not score any points, nor was it relevant to the determination of Armed Career Criminal status. *See id.*

In sum, the PSR reflected that Langley had three prior and distinct convictions for serious drug offenses, all of which occurred when he was over the age of eighteen. The underlying offense to which the defendant pleaded guilty—felon in possession—coupled with defendant's three prior qualifying offenses, led to his designation as an Armed Career Criminal.

Sentencing was held on November 13, 2013. ECF 54; ECF 55; ECF 56. At the time of sentencing, Mr. Langley was forty-three years of age. *See* ECF 34 at 1. He stood six-foot and one inch tall and weighed approximately 223 pounds. *Id.* ¶ 86. The PSR reflected that he had asthma, *id.*, as well as a "lengthy substance abuse history," dating to age thirteen. *Id.* ¶ 90.

The Court determined that the defendant qualified as an Armed Career Criminal.  *See* ECF 56.  Pursuant to 18 U.S.C. § 924(e)(1), the Court imposed the mandatory minimum sentence of 180 months' incarceration, ECF 55, with credit for time served from April 18, 2012 until January 8, 2013, and from August 31, 2013 until September 2, 2013.  *See* ECF 123-1 at 4; ECF 34.  Defendant was allowed to surrender, and was directed to do so on January 6, 2014. ECF 55 at 2.

Mr. Langley is currently incarcerated at FCI Allenwood-Low.  ECF 121; *see Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 21, 2021).  He has a projected release date of April 26, 2026.  ECF 123-1 at 3; *see Find an inmate*. And, he is eligible for home detention on October 26, 2025.  *Id*

At this point, defendant has served about 50% of his sentence.  And, accounting for good time credit, he has served approximately 58% of his sentence.

Mr. Langley has incurred three disciplinary infractions while serving his sentence.  In June 2014, he was sanctioned for possessing a hazardous tool (a cell phone).  ECF 123-3.  In April 2017, a visitor "grabbed him in the groin during [a] visiting good-bye," which resulted in an infraction for "engaging in sexual acts."  *Id.*   And, in December 2017, defendant received an infraction for disruptive conduct.  *Id.*  The "Report Remarks" for the third infraction state: "Email to text with 20 contacts with service – Unapproved . . . ."  *Id.*

Defendant asserts that he "has used his time in prison constructively, participating in numerous programs including but not limited to HVAC repair, plumbing, maintenance, forklift, culinary arts, cooking, business management, restaurant management, cleaning refrigeration systems."  ECF 128 at 7.  In addition, he states that he "successfully completed the court ordered drug rehabilitation program, which helped treat his drug addiction."  *Id.*  Looking ahead,

defendant states that upon release he would live with his mother and receive support from his immediate family members, and work "as a residential counselor . . . with mentally challenged patients." *Id.*

The defendant argues that his medical conditions of obesity (BMI of 31.1), asthma, and prediabetes justify his release. ECF 114 at 3. The government concedes that defendant's obesity qualifies him for release. ECF 123 at 5. Moreover, exhaustion is not contested. ECF 97 at 13.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See*

*Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D).

Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)     **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I)  suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

9

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered…to consider any extraordinary and

compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, __F.3d__, 2021 WL 1216543, at *3 (4th Cir. Apr. 1, 2021) (noting that court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130,

---

[2] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020).  For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. For Disease Control & Prevention (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at

---

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

223 (citation omitted).  As of April 21, 2021, COVID-19 has infected more than 31.8 million Americans and caused approximately 569,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 21, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See*

13

*Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

Unfortunately, there is currently no cure for the virus, although medical treatments have improved.  To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  Social distancing is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal

protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19.  The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On a positive note, the country has recently seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). The vaccines were initially made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons 16 years of age and older.  However, challenges remain in securing a vaccination.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with

[recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 5, 2021, the BOP had 126,111 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 122,935 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 5, 2021).

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[4]  As of April 21, 2021, BOP reported that 406 inmates out of a total of 126,474 inmates, and 596 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 46,483 inmates and 6,250 staff have recovered from the virus; and 223 inmates and four staff members have died

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 10, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.*

from the virus.   Moreover, the BOP has completed 110,239 COVID-19 tests.   *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 25, 2021).

With respect to FCI Allenwood Low, where defendant is now a prisoner, the BOP reported as of April 21, 2021, that zero inmates and one staff member tested positive for COVID-19, and 280 inmates and nineteen staff have recovered at the facility.   In addition, at the Allenwood complex, 394 staff members and 981 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 21, 2021).

### IV. Discussion

As mentioned, Mr. Langley contends that his medical conditions of obesity (BMI of 31.1), asthma, and prediabetes render him particularly vulnerable to COVID-19.   ECF 114 at 3. The government concedes that that the defendant's obesity satisfies the "extraordinary and compelling" prong of the § 3582 analysis.   ECF 123 at 5.   Accordingly, I am satisfied that defendant satisfies the "extraordinary and compelling" requirement.   However, that does not end the inquiry.

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).   To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).   These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote

18

respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Mr. Langley acknowledges the seriousness of his offense.  ECF 114 at 5.  But, he maintains that he no longer poses a danger to society.  *Id.*  In his view, at fifty years of age he poses a low risk of reoffending.  *Id.*  To that end, he asserts that after spending much of his adult life in penal institutions, he has no desire to engage in activity that would lead down the same path.  *Id.*  And, according to defendant, upon his return to society he would draw support from an "extensive system" of family and friends.  *Id.*

The government counters that Mr. Langley remains a danger to the community.  ECF 123 at 5-6.  His criminal history, including multiple prior drug offenses, loom large for the government.  In its view, defendant's record suggests that he would likely resume the "potentially lucrative activity" of drug distribution if released, especially given the difficult economic circumstances brought about by the pandemic.  *Id.* at 6.

In addition, the government contends that a reduction of Mr. Langley's sentence to time served would be inconsistent with the § 3553(a) factors.  In particular, granting defendant compassionate release at this juncture would fail to reflect the seriousness of the offense.  *Id.* at 6.  Moreover, the defendant's disciplinary infractions incurred during his sentence weigh heavily here, according to the government.  *Id.*  As mentioned, defendant was sanctioned three times during his sentence: once in 2014 and twice in 2017.  Last, the government asserts that defendant does not have a well-developed plan for reentry.  *See id.* at 7.

In his reply, Mr. Langley acknowledges that he received "three minor infractions" at FCI Allenwood Low between 2014 and 2017.  ECF 128 at 7.  And, he recognizes that he "has made

mistakes in the past . . . ." *Id.* But, he asserts that he has dedicated himself to rehabilitation and self-improvement while incarcerated by participating in a variety of educational and vocational programming, described *supra*, and by completing "the court ordered drug rehabilitation program, which helped treat his drug addiction." *Id.* "In sum," according to defendant, "the Larvon Langley of today is a different person than the person who entered prison almost ten years ago." *Id.*

With respect to Mr. Langley's criminal history, I agree with the government that defendant's multiple prior drug distribution and weapons convictions weigh heavily here. Defendant served about seven years in prison for the offenses that lay the basis for his status as an Armed Career Criminal. *See* ECF 34, ¶¶ 43, 46, 50. Yet, some three to four years after his release from incarceration, defendant continued down the wrong path and found himself in federal court.

Mr. Langley's record while incarcerated is mixed. Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020). That defendant has incurred three infractions weighs in the government's favor. However, according to the BOP record submitted by the government (ECF 123-3), the offense related to engaging in a sexual act apparently resulted from a visitor impermissibly touching defendant. *See id.* The record does not indicate that defendant himself inappropriately touched his visitor. *See id.* And, defendant asserts that he has prioritized rehabilitation by participating in several educational and vocational programs. Perhaps most important, he has confronted his drug dependency and completed a rehabilitation program.

As noted, Mr. Langley has served about 50% of his sentence, and approximately 58% of his sentence when accounting for good time credit. At fifty years of age, he can still look forward to many years after he is released. And, his sentence was below the Guidelines range. Congress clearly regards the underlying offense as a serious one, given the mandatory minimum sentence of fifteen years that was applicable. *See* 18 U.S.C. § 924(e)(1).

In view of the serious nature of defendant's offense, his prior record, and the amount of time he has served to date, I conclude that defendant has not yet met the requirements for immediate compassionate release. However, considering defendant's health, the challenges posed by the pandemic, and his commitment to self-improvement while in custody, I conclude that an 180-month sentence is "greater than necessary" to comply with the purposes of incarceration. 18 U.S.C. § 3553(a).

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, Crim No. JKB-09-478, 2020 WL 4748536 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have found that a court "need not choose between immediate, unconditional release or no relief at all" and have, accordingly, granted sentence reductions that did not result in immediate release. *See, e.g., United States v. Johnson*, No. RDB-07-0153, ECF No. 183 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months

to 168 months); *United States v. Marks*, Crim No. 03-6033L, 2020 WL 1908911, at \*17 (W.D.N.Y. Apr. 20, 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05- 00029, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence…").

### V.  Conclusion

For the reasons set forth above, I conclude that a total sentence of 150 months is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).  That sentence is substantially longer than any prior sentence that defendant has received.  And, in the federal system, there is no parole, unlike in the Maryland system.

Therefore, I shall grant the Motion (ECF 87, ECF 89, ECF 114), in part, pursuant to the Court's discretionary authority under 18 U.S.C. § 3582(c)(1)(A).  I shall reduce Mr. Langley's sentence for Count One from 180 months to 150 months of incarceration.  I shall adopt all of the previously imposed terms and conditions of supervised release, with the added condition of supervised release, as set forth in the attached Order, to include a four-month period of home confinement.

An Order follows, consistent with this Memorandum Opinion.

Date: April 22, 2021                                    /s/
                                        Ellen L. Hollander
                                        United States District Judge

22